STATE OF OHIO ex rel. ERKENBRECHER v. COX, Governor of Ohio.

(District Court, S. D. Ohio, W. D. January 4, 1919.)

No. 163.

1. COURTS ⚖➡343—FEDERAL COURTS—MISJOINDER OF PARTIES PLAINTIFF— SUIT BY TAXPAYER JOINING ALL CITIZENS—EQUITY RULE—"JOINT CAUSES OF ACTION."

Under equity rules 26 and 38 (201 Fed. v, 118 C. C. A. v; 198 Fed. xxix, 115 C. C. A. xxix), in suit by a citizen of Ohio and of the United States, joining all citizens of the United States, against the Governor of Ohio, to enjoin transmission by him to the General Assembly of the state of a proposed amendment to the federal Constitution prohibiting the manufacture, sale, etc., of intoxicating liquors within the state, there is a misjoinder of parties plaintiff, as there would be if the suit were brought alone in behalf of plaintiff as taxpayer and all other taxpayers similarly interested; the causes of action not being joint within the rules.

[Ed. Note.—For other definitions, see Words and Phrases, Second Series, Joint Cause of Action.]

2. INJUNCTION ⚖➡75—TRANSMISSION OF PROPOSED AMENDMENT TO FEDERAL CONSTITUTION TO STATE LEGISLATURE—ABSENCE OF EMERGENCY.

The suit of a taxpayer in a federal judicial district in the state of Ohio, also as a citizen of the state and the United States, joining with him all citizens of the United States, to enjoin the Governor of Ohio from transmitting to the General Assembly of the state the proposed amendment to the federal Constitution prohibiting the manufacture, sale, etc., of intoxicating liquors, involves no such extraordinary emergency or irreparable injury to constitutional rights as to induce the court to direct the writ to proceed and make a precedent, if necessary, in the sense of applying old principles to new states of fact.

⚖➡For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

3. INJUNCTION ⟨key⟩75—RESTRAINING TRANSMISSION OF PROPOSED CONSTITU-
TIONAL AMENDMENT—ABSENCE OF JURY.

A suit will not lie against the Governor of Ohio in behalf of a taxpayer
in a federal judicial district of the state, suing as such and as a citizen
of the state and the United States, and joining all citizens of the United
States, to restrain the Governor from transmitting to the state Legislature
the proposed amendment to the federal Constitution prohibiting the manu-
facture and sale of intoxicating liquors, since the Governor's threatened
act of itself cannot injure plaintiff, as even in the absence of action by
the Governor the Legislature can act on the amendment.

4. INJUNCTION ⟨key⟩75—TRANSMISSION OF CONSTITUTIONAL AMENDMENT BY GOV-
ERNOR—IRREPARABLE INJURY.

Since, if the proceedings in the federal Senate and House in relation to
proposing an amendment to the federal Constitution prohibiting the
manufacture and sale of intoxicating liquors were not in accordance with
the Constitution, any citizen of Ohio may show to its General Assembly
wherein they were violative of the Constitution, the action of the Governor
of Ohio in transmitting to the Legislature for ratification the proposed
prohibition amendment cannot result in irreparable injury to a citizen of
Ohio and the United States.

5. CONSTITUTIONAL LAW ⟨key⟩70(1), 73—SEPARATION OF POWERS OF GOVERNMENT
—RESTRAINING TRANSMISSION OF PROPOSED CONSTITUTIONAL AMENDMENT
TO LEGISLATURE.

The District Court of the United States, at suit of a taxpayer and
citizen of the state of Ohio and the United States, joining as plaintiffs all
citizens of the United States, has no power to enjoin the Governor of Ohio
from transmitting to the General Assembly of the state for ratification
or rejection the proposed amendment to the federal Constitution prohibit-
ing the manufacture and sale of intoxicating liquors on any ground that
the amendment has not been proposed in accordance with the Constitution,
as the step would be an interference with the executive and legislative
powers by the judiciary.

6. INJUNCTION ⟨key⟩75—ABSENCE OF ADEQUATE REMEDY—PROHIBITION OF TRANS-
MISSION OF PROPOSED CONSTITUTIONAL AMENDMENT.

Merely because a citizen and taxpayer of Ohio and the United States
has no adequate remedy or any remedy at law against an amendment
to the Constitution of the United States prohibiting the manufacture and
sale of intoxicating liquors, illegal because not proposed by Congress as
provided by the Constitution, such citizen and taxpayer is not entitled
to injunction restraining the Governor of Ohio from transmitting the
amendment to the General Assembly of the state for action.

7. STATES ⟨key⟩4—RESERVATION OF POWERS NOT DELEGATED TO UNITED STATES.

The addition to the Constitution of the United States of an amendment
prohibiting the manufacture, sale, etc., of alcoholic liquors, is an amend-
ment of the organic law, and not prohibited by article 10, reserving to
the states or people the powers not delegated to the United States by the
Constitution, nor prohibited by it to the states.

8. COURTS ⟨key⟩282(1)—FEDERAL COURTS—SUIT NOT INVOLVING FEDERAL QUES-
TION.

A suit by a citizen and taxpayer of the state of Ohio and the United
States, joining as plaintiffs all citizens of the United States, to enjoin the
Governor of Ohio from transmitting to the state Legislature for action the
proposed amendment to the federal Constitution prohibiting the manu-
facture and sale of intoxicating liquors, involves no federal question or
deprivation of plaintiff's rights prior to the adoption of the amendment.

9. COURTS ⟨key⟩328(1)—FEDERAL DISTRICT COURT—JURISDICTIONAL AMOUNT.

District Court of the United States held without jurisdiction of suit by
a taxpayer and citizen of Ohio and the United States, joining as plaintiff
all citizens of the United States, to enjoin the Governor of Ohio from

⟨key⟩For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

transmitting to the state Legislature for action the proposed amendment to the federal Constitution prohibiting the manufacture and sale of intoxicating liquors; the jurisdictional amount of $3,000 not being involved.

10. CONSTITUTIONAL LAW ☞10—AMENDMENTS—"TWO-THIRDS OF BOTH HOUSES"—"HOUSE."

The requirement of Const. U. S. art. 5, that "two-thirds of both houses" shall propose amendments for adoption or rejection by the state Legislatures, means two-thirds of a quorum of each house, and not two-thirds of the whole membership of each, since "house" means a body of men united in their legislative capacity.

11. CONSTITUTIONAL LAW ☞10—ADOPTION OF AMENDMENT—SUBSEQUENT ATTACK ON ADOPTION.

If the record of the proposal and adoption of an amendment to the federal Constitution can be attacked at all, it can be attacked after the adoption by the states of the amendment, and proceedings had to enforce legislation enacted to carry the amendment into effect.

In Equity. Suit by the State of Ohio, on the relation of Albert G. Erkenbrecher, against James M. Cox, as Governor of Ohio. Bill dismissed.

Aaron A. Ferris, of Cincinnati, Ohio, Everett P. Wheeler, of New York City, and Charles B. Wilby, of Cincinnati, Ohio, for plaintiff.

Jos. McGhee, Atty. Gen., of Ohio, L. D. Johnson, of Urbana, Ohio, Wayne B. Wheeler, of Washington, D. C., Simeon M. Johnson, of Cincinnati, Ohio, and James A. White, of Columbus, Ohio, for defendant.

HOLLISTER, District Judge. Albert G. Erkenbrecher, a resident of Cincinnati and a citizen of Ohio, requested the Attorney General of Ohio to bring this suit, and, having been denied, files this bill against James M. Cox, as Governor of Ohio, a citizen of that state and a resident in the Western division of the Southern district. The suit is brought by complainant—

"as such citizen and as a taxpayer in said district and interested in public welfare * * * in his own behalf and in behalf of the citizens of the state of Ohio, and other citizens of the United States who may desire to join in the action and contribute to the expenses of the suit."

The further allegations of the bill may be briefly stated:

The Governor has now in his custody, ready to be transmitted by him to the General Assembly of Ohio, at its next session beginning January 6, 1919, the proposed amendment to the federal Constitution, reading:

"Sixty-Fifth Congress of the United States of America.

"At the second session begun and held at the city of Washington, on Monday, the third day of December, one thousand nine hundred and seventeen.

"Joint Resolution Proposing an Amendment to the Constitution of the United States.

"Resolved by the Senate and House of Representatives of the United States of America in Congress assembled (two-thirds of each house concurring therein), that the following amendment to the Constitution be, and hereby is, proposed to the states, to become valid as a part of the Constitution when ratified by the Legislatures of the several states as provided by the Constitution:

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

"Article ———.

"Section 1. After one year from the ratification of this article the manu-
facture, sale or transportation of intoxicating liquors within, the importation
thereof into, or the exportation thereof from the United States and all terri-
tory subject to the jurisdiction thereof for beverage purposes is hereby pro-
hibited.

"Section 2. The Congress and the several states shall have concurrent power
to enforce this article by appropriate legislation.

"Section 3. This article shall be inoperative unless it shall have been ratified
as an amendment to the Constitution by the Legislatures of the several states,
as provided in the Constitution, within seven years from the date of the sub-
mission hereof to the states by the Congress"

—which, in his ministerial capacity, and having no discretion, he
threatens to and will transmit to the General Assembly, unless re-
strained by this court. The recital that "two-thirds of each House"
concurred in the proposed amendment was and is untrue and mis-
leading, in that, when the Senate of the United States finally voted
on the proposed amendment it was composed of ninety-five members
elected and qualified, of whom only forty-seven voted in favor of the
proposed amendment, a vote less than two-thirds of the membership
of that house; that when the vote was taken in the House of Rep-
resentatives, its total membership was four hundred and thirty-four
members elected and qualified, and that only two hundred and eighty-
two members voted in favor of the proposed amendment, a vote less
than two-thirds of the membership of that house.

The vote in the Senate and in the House was not in accord with, and
was in violation of, article V of the Constitution of the United States,
which reads:

"Article V.

""The Congress, whenever two-thirds of both houses shall deem it necessary,
shall propose amendments to this Constitution, or, on the application of the
Legislatures of two-thirds of the several states, shall call a convention for
proposing amendments, which, in either case, shall be valid to all intents and
purposes, as part of this Constitution, when ratified by the Legislatures of
three-fourths of the several states, or by conventions in three-fourths thereof,
as the one or other mode of ratification may be proposed by the Congress:
Provided that no amendment which may be made prior to the year one
thousand eight hundred and eight shall in any manner affect the first and
fourth clauses in the ninth section of the first article, and that no state, without
its consent, shall be deprived of its equal suffrage in the Senate."

The transmission of the proposed amendment to the General Assem-
bly "would operate as and be a fraud upon the citizens of Ohio and
of the United States, in that it would certify that two-thirds of each
House of the Congress had voted in favor of the alleged amendment,
whereas less than two-thirds of each house had voted therefor."

From the beginning a large part of the revenue of the government
has been derived from taxes upon distilled spirits, wine, and beer,
which also have been subject to duties when imported, and that the
revenue of the United States from excise duties upon these commodi-
ties during the fiscal year ending June 30, 1918 was $284,008,512.

The United States has encouraged the production of wine and beer

by giving premiums to the producers of these commodities, and also by discriminative duties upon imported wine and beer, with the result that over $1,000,000,000 have been invested in breweries, vineyards, the production of barley and hops, and the manufacture of wine. The by-products from the manufacture of beer are yeast cakes and brewers' grains, of nourishing quality as a food for cattle; such products amounting annually to over $20,000,000. The adoption and enforcement of the proposed amendment would destroy in part and impair in part the value of the capital so invested, and diminish the revenues of the government, which would necessitate the imposition of other taxes additional to those now levied and be a heavy burden upon the taxpayers of this country.

The proposed amendment is not in any legal sense an amendment to the Constitution, but, if ratified by three-fourths of the states, would tend to subvert the republican form of government established by the Constitution and ratified by the people, and would violate its spirit, intent, and meaning. Its ratification would be in derogation and in violation of the Tenth Amendment, reserving to the states and to the people all powers not delegated to the United States by the Constitution nor prohibited by it to the states, and, if ratified, would deprive citizens of liberty and property without due process of law, in violation of the Fourteenth Amendment.

The complainant has no other remedy except by injunction in equity, for which he prays, both preliminary and perpetual, enjoining James M. Cox, as Governor, from transmitting the proposed amendment to the General Assembly at its next or any subsequent session.

The issues so tendered are raised by the answer.

The case was argued and submitted December 24, 1918. Some of the briefs were filed later, the latest December 31st, and the case should be decided before Monday, January 6, 1919, the day on which the General Assembly of Ohio convenes. The time is short, but the court has been able to give some—it is hoped adequate—consideration to the issues now herein dealt with.

1. Counsel agree that, although the Governor's official residence is at Columbus, in the Eastern division of this Southern district of Ohio, yet he is a resident of Dayton, in the Western division, and that, so far as the defendant's residence is concerned, the bill is properly filed in the Western division.

[1] 2. Equity rule 26 (201 Fed. v, 118 C. C. A. v.) provides, among other things:

"But when there is more than one plaintiff, the causes of action joined must be joint."

Rule 38 (198 Fed. xxix, 115 C. C. A. xxix) reads:

"When the question is one of common or general interest to many persons constituting a class so numerous as to make it impracticable to bring them all before the court, one or more may sue or defend for the whole."

There is a misjoinder of parties plaintiff. Plaintiff sues as a taxpayer in this district, and also as a citizen of Ohio and of the United States interested in the public welfare, and as such joins with him all

the citizens of the United States. Some of these are no doubt taxpayers in this district, and some taxpayers in other parts of the United States. But it is probable that the majority of citizens of the United States are not taxpayers, though they are all interested in the public welfare. The taxpayer's interest is quite different from the public interest all citizens have in maintaining the integrity of the Constitution. One is a property interest; the other intangible and personal in its nature, having to do with political rights.

There is more than one plaintiff, and the injury for which the remedy of injunction is sought affects some of the plaintiffs in one way and all in another. These causes of action are not joint.

The bill, under its allegations, is not properly a "class action," because the classes claimed by plaintiff to be represented by him are different, as above stated. For these reasons the bill cannot be maintained.

Moreover, if the suit were brought alone in behalf of plaintiff as a taxpayer, and all other taxpayers similarly interested, there would be a clear misjoinder. The right of each is a separate, individual right, not a right common to all taxpayers. In any event, an injunction at plaintiff's instance will not issue to protect the others. Scott v. Donald, 165 U. S. 107, 115, 116, 17 Sup. Ct. 262, 41 L. Ed. 648.

[2] 3. If the plaintiff had sued solely as a citizen, claiming to represent also all the citizens of the United States, it might be said that all citizens have a common interest in safeguarding the Constitution and in the maintenance of its integrity to the last detail. But it is only in comparatively recent years that the writ of injunction was issued to protect other than property rights. Mugler v. Kansas, 123 U. S. 623, 672, 8 Sup. Ct. 273, 31 L. Ed. 205; In re Debs, 158 U. S. 564, 583, 584, 15 Sup. Ct. 900, 39 L. Ed. 1092.

It may be, if the threatened act of the Governor involved an extraordinary emergency, and, but for injunction, constitutional rights would be irreparably injured, the court would direct the writ to proceed, and make a precedent, if necessary, in the sense of applying old and well-established principles to a new state of facts (the subject is discussed at length in State of Ohio ex rel. J. M. Sheets, Attorney General, v. Hobart, et al., 8 Ohio N. P. 246, 269, 270); but this case presents no such emergency, and the writ will be denied.

[3] 4. Of course, the Governor has not in his custody the proposed amendment. What he has in his custody is a certified copy of the joint resolution of the Senate and House of Representatives proposing the amendment (which is set forth at length), signed by the Speaker of the House and the Vice President of the United States, certified by the Secretary of the Senate and by the Clerk of the House, in both of which is recited, "two-thirds of each house concurring therein." This certificate was sent to the Governor by the Secretary of State, who, through no requirement of law, but in compliance with custom, transmitted a similar copy to the Governor of each state.

The Constitution does not provide how the passage of such joint resolution may be promulgated, nor is there any act of Congress on the subject. The provision found in 1 Comp. Stat. 1901, § 205, p. 104

(Comp. St. § 303), has to do only with the promulgation, by publication by the Secretary of State in the newspapers, of the adoption of an amendment.

There is no requirement in the Constitution or laws of the United States imposing any duty on the Secretary of State to transmit to the Governor the evidence of the passing of such a resolution. Neither the Constitution and laws of the United States nor the Constitution and laws of Ohio impose any duty upon the Governor to transmit the certified copy of the joint resolution to the General Assembly of Ohio. The Governor admits his purpose to do so, and this suit is to restrain the threatened act. In so doing he does not act as Governor; he acts as a private citizen, who happens to be Governor at the time. If he should refuse, no one could compel him by mandamus to do so.

How, then, can he be enjoined, as Governor, from an act which is merely a convenient method of getting the information to the General Assembly in a somewhat formal way that the initial step for the proposed amendment had been taken by the two Houses of Congress? Of course, if the act itself of the individual was that which did the wrong; if the Governor, acting through no authority or requirement of law and in his individual capacity, would or could injure complainant, and there were no adequate remedy at law, and the complainant's injury would be irreparable, no doubt a court of equity would reach out its strong arm and prevent it. But such injury, if any, as the complainant may receive by the ratification of the amendment by the General Assembly of Ohio, is not done by the Governor in transmitting this certificate.

It is not open to doubt that every member recently elected to the General Assembly knows of the existence of the proposed amendment, and every one knows that the subject is of such interest in the state of Ohio, as well as elsewhere, that there are members of the General Assembly about to sit who will see to it that the subject is brought to the attention of the General Assembly. Moreover, it is the right of every citizen to petition the General Assembly, showing the purported passage of the joint resolution and asking for action thereon. Whatever injury, if any, may result by the consideration by the General Assembly of the proposed amendment, will follow, whether the Governor acts or not. The Governor's threatened act cannot of itself do plaintiff any injury of any kind, and therefore the suit will not lie against him.

[4] 5. The writ of injunction is an extraordinary remedy, to be issued only when the threatened injury, unless restrained, would be irreparable. If the proceedings in the Senate and in the House were not in accordance with the applicable provision of the Constitution, plaintiff, or any citizen of Ohio, by petition, if no member of the General Assembly acts, may show to the General Assembly, if it can be shown, in what respect they are violative of the Constitution. It cannot be assumed in advance that the General Assembly of Ohio will take any action violative of the Constitution of the United States. Moreover, if the two houses of the General Assembly should take a

vote on the subject, one cannot say in advance what the result would be. The proposed amendment may be rejected, because the members of the General Assembly may think the proceedings at Washington were not in consonance with the Constitution, or because of insufficient votes in the affirmative. Indeed, the General Assembly may take no action at all. So far as one state in the Union is concerned, out of the three-fourths necessary for the adoption of the amendment, it may be that the affirmative action of the Ohio General Assembly would be an injury to the plaintiff, if he were otherwise in a position to claim injury; but the writ of injunction does not issue to restrain acts which may or may not be injurious.

Moreover, if the plaintiff is injured, that injury does not arise until the proposed amendment is adopted by the respective Legislatures of three-fourths of the states. Who can say that that result will come to pass within the seven years the state Legislatures are given to act? The act of the Governor and the affirmative act of the General Assembly would not be an irreparable injury, or any injury, to the plaintiff, if the requisite number of states, by their Legislatures, did not adopt the amendment. However that may be, and whatever the extent of the injury to the plaintiff affirmative action by the General Assembly of Ohio might be, it cannot be said that the act of the Governor in transmitting this certified copy constitutes an irreparable injury to the plaintiff.

. Since restraint on the Governor is the only relief sought, injunction must be denied, because no irreparable injury will result from what he threatens to do.

[5] 6. The case is anomalous. The judicial department of the government, either national or state, cannot interfere with the preliminary proceedings of either the executive department or the legislative department with respect to matters committed by the Constitution to their charge. So far as this court is aware, judicial action has never been taken, or even thought of, against any step of the legislative department leading up to the enactment of a law, however subversive of the Constitution. It is only after proceedings are taken to enforce the unconstitutional law that the courts are called upon to act at all; indeed, the question whether the courts had any power in such case was not settled until some time after the adoption of the Constitution. There are many, even now, who claim the judicial department has no power to declare a legislative act to be unconstitutional; the Supreme Court of the United States to the contrary notwithstanding.

By what right, then, can a court of the United States, or any court, interfere with the preliminaries preceding legislative action by the General Assembly of Ohio? The legislative department of Ohio consists of a General Assembly of two houses, with whose proceedings no court, national or state, is concerned until the time comes when, by some enactment, constitutional rights of citizens, lodged either in the national or in the state Constitution, have been injured. Surely the courts are not concerned with any preliminary proceedings leading up to legislation. This suit is against the Governor in his official capacity. Even if it is assumed that his threatened act is official, it is now held that this court has no power to enjoin him from acting.

[6] 7. It may be plaintiff has no adequate remedy, or any remedy, at law; but it does not necessarily result that for that reason alone he is entitled to an injunction. Plaintiff says his rights are injured by the failure of the houses of Congress, in passing the resolution, to observe the requirements of the Constitution, and, since he has suffered a wrong, there must be a remedy. His conclusion is good, but his premise is bad. His right does not arise, and the wrong is not suffered, until the Legislatures of three-fourths of the states have voted to adopt the amendment. Then will be the time for him to show, if he can, that the resolution of the two houses of Congress was no resolution at all, and the action of the states thereon a futility. For this reason, also, this suit cannot be maintained.

[7] 8. It is urged that such a subject as is involved here is within the powers reserved to the states or to the people, and article 10 of the Constitution is invoked:

"The powers not delegated to the United States by the Constitution, nor prohibited by it to the states, are reserved to the states respectively, or to the people."

Counsel do not favor the court with decisions on this subject, but, granting to the claim all that may be argued for it, it must be said that the members of the Senate and the members of the House are the representatives of the states and the representatives of the people, respectively, to whom is given the power to propose amendments to the Constitution, which become such only when the representatives of the people in three-fourths of the states concur. Reserved powers are so called because they have never been surrendered. When the requisite number of states concur, the people surrender to the United States additional power. It may be absolute, or it may be concurrent, becoming absolute only when Congress shows an intention of occupying the whole field embraced by the particular subject.

One of the declared purposes in the preamble to the Constitution is to "promote the general welfare." It is not necessary to dwell at length on the evils of the liquor traffic. Mr. Justice Field, in Crowley v. Christensen, 137 U. S. 86, 91, 11 Sup. Ct. 13, 34 L. Ed. 620; Mr. Justice Harlan, in Mugler v. Kansas, 123 U. S. 623, 8 Sup. Ct. 273, 31 L. Ed. 205. Everybody knows them. Even those interested in the business do not deny the wisdom of regulating the traffic, so as so far as possible, to minimize its evils. The states, in the exercise of police powers, may prohibit, and there seems to be no reason why the states should not surrender, in the method provided by the Constitution, further of their reserved powers, and thus delegate them to the national government. So, when the surrender is made by the people in the way provided, the amendment is by the people, in whom lay the power to make their Constitution, and in whom lies the power to change it, and to add to it for the public welfare, if they consider the subject to involve the public welfare.

But it is urged, as I understand it, that an amendment must be germane to that which it amends, and that there is no clause in the Constitution to which the proposed amendment is in any way related. Assuming, however, that it is not, yet one is not willing to go so far

as to say that the people have limited their right to surrender their power over any subject theretofore reserved, because unrelated to any power theretofore surrendered. The amendment goes to the Constitution as a whole, not necessarily to any particular clause in it. The Constitution is the organic and fundamental law, but that law may be changed, added to, or repealed, if that is done by the states and the people themselves in the way provided. Their power to better it, as they think, is not to be hamstrung by mere rigidity of definition of words. Adding something new to the organic law is an amendment of the organic law, in the judgment of this court.

[8] 9. Moreover, plaintiff's rights do not arise, and no wrong is done to him, until the attempt to delegate the reserved power is at least apparently consummated and something is done in the exercise of the power. The Legislature of Ohio may not ratify the proposed amendment. If it does, the Legislatures of three-fourths of the states may not ratify it. Who can tell? If the required number ratify, then will be the time, as hereinbefore said, for the plaintiff to assert his rights and seek to redress his wrongs. No present constitutional right is involved in this behalf, and the same may be said, once for all, of every alleged deprivation of constitutional rights in this case. This case, therefore, involves no federal question.

It is said in St. Joseph Co. v. Steele, 167 U. S. 659, 662, 17 Sup. Ct. 925, 926 (42 L. Ed. 315):

"A federal question, * * * to confer original jurisdiction on a Circuit Court of the United States. * * * must be a real substantive question, on which the case may be made to turn."

The suit must involve, necessarily, a question depending on the laws, Constitution, and treaties of the United States. Railroad v. Myers, 115 U. S. 1, 12, 5 Sup. Ct. 1113, 29 L. Ed. 319. Can it be doubted that, if plaintiff is defeated in this case, he may still raise the question after the requisite number of states has ratified, and Congress, or the state of Ohio, or both, have taken some action to render the amendment effective? He can show then, as well as he can now, if he can at all, the actual number of those present in each house when the vote on the resolution was taken.

"The suit must be such that some right, privilege, immunity, or title on which recovery depends will be defeated by one construction of the Constitution or laws, or sustained by a contrary construction." Simkins' Federal Equity Suit, 135.

By the decision of this case against him, the plaintiff loses no constitutional right.

[9] 10. The jurisdiction of this court is limited to actions involving $3,000, not including interest and costs. The bill alleges that the jurisdictional amount is involved. Looking at the plaintiff, or those he represents, as taxpayers, there is no allegation that any particular sum to him, or to any one of them, is involved; and considering the plaintiff, and those he claims to represent, as citizens of the United States seeking to remedy a political wrong, there is no amount of money involved.

It is alleged that the result of the Prohibition Amendment would be a loss to the government of many millions of dollars, which would have to be made up otherwise. That may be true temporarily, but it may also be that the results of prohibition will be such as to make a wealthier people, a people better able to bear the financial burdens of government, and that a temporary loss of revenue from this particular source would be more than counterbalanced by increased capacity to carry those burdens. It was said by Mr. Justice Grier in the License Cases, 5 How. 504, 631 (12 L. Ed. 256):

"If a loss of revenue should accrue to the United States from a diminished consumption of ardent spirits, she would be the gainer a thousand fold in the health, wealth, and happiness of the people."

In any event, it is manifest that the increased burden would come through indirect taxation, impossible of ascertainment, highly vague and conjectural, and not of the kind measurable by the law. Moreover, if it were ascertainable, it would have to be shown that the loss to at least one citizen would amount to the jurisdictional amount, because individual claims of unjust taxation cannot be aggregated for the purpose of making a sum within the jurisdiction of this court.

Counsel for plaintiff expressly disclaim appearing for any one interested in the liquor traffic. Indeed, they say they have declined retainers from some so interested. They and their client take the high ground that their interest lies deeper than questions of property rights, and grows out of their love of country and their desire to protect it, by insisting that all the safeguards of the Constitution be maintained inviolate. The court believes them.

But, if they did represent such interests, it was settled by the Supreme Court long ago that no one has an inherent right to conduct that traffic, and if any one makes an investment in it, however large, he does it with the knowledge that such property rights as he would otherwise have in the business he has built up are necessarily overborne by the greater right of the public, through the exercise of police power, to enhance the public health, morals, and welfare. So no right of pecuniary value, or any value, is involved in this behalf.

It was said by Mr. Justice Matthews, in Barry v. Edmunds, 116 U. S. 550, 560, 561, 6 Sup. Ct. 501, 507 (29 L. Ed. 729):

"The amount of damages laid in the declaration, however, in cases where the law gives no rule, is not conclusive upon the question of jurisdiction; but if upon the case stated there could legally be a recovery for the amount necessary to the jurisdiction, and that amount is claimed, it would be necessary, in order to defeat the jurisdiction since the passage of the act of March 3, 1875, for the court to find, as a matter of fact, upon evidence legally sufficient, 'that the amount of damages stated in the declaration was colorable, and had been laid beyond the amount of a reasonable expectation of recovery, for the purpose of creating a case' within the jurisdiction of the court. Then it would appear to the satisfaction of the court that the suit 'did not really and substantially involve a dispute or controversy properly within the jurisdiction of said Circuit Court.'"

When an injunction is sought, the amount in controversy is the value of the injunction. Bureau v. Sells (D. C.) 211 Fed. 379, 383. The injunction sought here has no pecuniary value to the plaintiff,

measured by any legal standard. Moreover, it has been hereinbefore shown that the act sought to be enjoined will not in itself deprive the plaintiff of any right, monetary, personal, or political.

It is this court's opinion, not upon "personal conviction," but on facts distinctly appearing, that the jurisdiction is only colorable, and does not really exist, and the bill should be dismissed upon this ground also.

11. It is urged for defendant that the certificate showing the concurrence of two-thirds of each house is conclusive, and reliance is had upon Field v. Clark, 143 U. S. 649, 12 Sup. Ct. 495, 36 L. Ed. 294, in which it was held:

"The signing by the Speaker of the House of Representatives and by the President of the Senate, in open session, of an enrolled bill, is an official attestation by the two houses that such bill has passed Congress; and when the bill, thus attested, receives the approval of the President, and is deposited in the public archives according to law, its authentication as a bill that has passed Congress is complete and unimpeachable."

It was said by Mr. Justice Harlan (143 U. S. 680, 12 Sup. Ct. 500, 36 L. Ed. 294):

"We are of opinion, for the reasons stated, that it is not competent for the appellants to show, from the journals of either house, from the reports of committees, or from other documents printed by authority of Congress, that the enrolled bill designated 'H. R. 9416,' as finally passed, contained a section that does not appear in the enrolled act in the custody of the State Department."

Also (143 U. S. 671, 12 Sup. Ct. 497, 36 L. Ed. 294):

"Although the Constitution does not expressly require bills that have passed Congress to be attested by the signatures of the presiding officers of the two houses, usage, the orderly conduct of legislative proceedings, and the rules under which the two bodies have acted since the organization of the government, require that mode of authentication.

"The signing by the Speaker of the House of Representatives, and by the President of the Senate, in open session, of an enrolled bill, is an official attestation by the two houses of such bill as one that has passed Congress. It is a declaration by the two houses, through their presiding officers, to the President, that a bill thus attested has received, in due form, the sanction of the legislative branch of the government, and that it is delivered to him in obedience to the constitutional requirement that all bills which pass Congress shall be presented to him; and when a bill thus attested receives his approval, and is deposited in the public archives, its authentication as a bill that has passed Congress should be deemed complete and unimpeachable. * * * The respect due to coequal and independent departments requires the judicial department to act upon that assurance, and to accept, as having passed Congress, all bills authenticated in the manner stated, leaving the courts to determine, when the question properly arises, whether the act, so authenticated, is in conformity with the Constitution."

The journals of the two houses, though required by the Constitution to be kept, were held not to be open for investigation in judicial proceedings. There is ground for holding that as against such a certificate as is involved here the court cannot enter into an inquiry as to the make-up of either house at the time the vote was taken; but, as it is not necessary in the disposition of this case to decide the question, no opinion is here expressed thereon, and the next inquiry goes to the merits of the question:

[10] 12. What is meant in article 5 by the expression, "Whenever two-thirds of both Houses shall deem it necessary?" It is argued that "two-thirds of both houses" means two-thirds of the members elected to those houses, and not two-thirds of a quorum. If this is right, then the joint resolution did not receive the necessary two-thirds in either house. It is argued with much force that, when the framers of the Constitution required action by a fractional part of the members to be effective with respect to certain subjects-matter, the fraction always had coupled with it the "members present." Article 1, § 3, par. 6, provides, in the trial of impeachments by the Senate:

"* * * And no person shall be convicted without the concurrence of two-thirds of the members present."

Article 1, § 5, par. 3, as to the demand for the ayes and nays:

"* * * And the yeas and nays of the members of either house on any question shall, at the desire of one-fifth of those present, be entered on the journal."

As to making treaties, article 2, § 2, par. 2:

"* * * He [the President] shall have power, by and with the advice and consent of the Senate, to make treaties, provided two-thirds of the Senators present concur. * * *"

But, when the subject-matter is an amendment of the Constitution, or the passing of an act over the President's veto, it is required that "two-thirds of both houses" shall concur, as to one, and "two-thirds of that house" in which the bill originated shall agree to pass the bill over the veto, as to the other. This, it is said, shows conclusively the purpose to require, in these especially important matters, the concurrence of two-thirds of the entire membership, as distinguished from two-thirds of a quorum or two-thirds of those present.

What does "house" mean? Webster says:

"One of the estates of a kingdom assembled in Parliament or Legislature; a body of men united in their legislative capacity; as the House of Lords, or Peers, of Great Britain, the House of Commons, the House of Representatives."

So, when we speak of "both houses," we mean the members meeting in their legislative capacity. While passing such a resolution is not a legislative act, in the sense that it is the enactment of a law, yet it is action by the legislative bodies assembled in their legislative capacity. Indeed, a resolution is the first step in that which may result, as has often resulted, in establishing, and in that sense enacting, the fundamental law which is the supreme law of the land. In passing the resolution each house acts in the same capacity in which it enacts ordinary legislation; and when we say that a bill or resolution has passed the Senate or House, as the case may be, we mean that it has received the number of votes required for the transaction of business. Section 5 of article 1 provides:

"Each house shall be the judge of the elections, returns, and qualifications of its own members, and a majority of each shall constitute a quorum to do business. * * *"

A part of the business of the Senate and of the House is to pass laws; a part of its business is to pass joint resolutions proposing amendments to the Constitution. If a quorum is present, they may transact that business. If a majority of a quorum in either house votes for a bill, it passes that house. If two-thirds of a quorum in each house votes for the resolution, it passes the house, in the ordinary course of the legislative business intrusted to it by the Constitution.

In United States v. Ballin, 144 U. S. 1, 5, 12 Sup. Ct. 507, 509 (36 L. Ed. 321) the Supreme Court, speaking through Mr. Justice Brewer, said:

"The Constitution provides that 'a majority of each [house] shall constitute a quorum to do business.' * * * Its capacity to transact business is then established, created by the mere presence of a majority, and does not depend upon the disposition or assent or action of any single member or fraction of the majority present. All that the Constitution requires is the presence of a majority, and when that majority are present the power of the House arises."

And at page 6 of 144 U. S., at page 509 of 12 Sup. Ct. (36 L. Ed. 321):

" * * * The general rule of all parliamentary bodies is that, when a quorum is present, the act of a majority of the quorum is the act of the body. This has been the rule for all time, except so far as in any given case the terms of the organic act under which the body is assembled have prescribed specific limitations; as, for instance, in those states where the Constitution provides that a majority of all the members elected to either house shall be necessary for the passage of any bill. No such limitation is found in the federal Constitution, and therefore the general law of such bodies obtains."

Among the many cases cited is State v. Deliesseline, 1 McCord (S. C.) 43, 49, in which it is said:

"For, according to the principle of all the cases referred to, a quorum possesses all the powers of the whole body; a majority of which quorum must of course govern. * * * The Constitutions of this state and of the United States declare that a majority shall be a quorum to do business; but a majority of that quorum are sufficient to decide the most important question."

Since the "body" is the "house," and a majority of a quorum transact the business of the house in passing a bill, so two-thirds of a quorum passes a resolution proposing an amendment. So it seems to this court.

If the plaintiff's contention is right, then if, through sickness or unavoidable cause, or because of vacancies, two-thirds of the authorized membership is absent, action on such a joint resolution could not be taken at all, and the "business of the house," a part of which comprehends resolutions, could not proceed in that behalf, although a quorum for the transaction of all the business of the house is present. If the framers of the Constitution had intended, by the use of the word "house," a different meaning from its universal meaning when applied to the ordinary business of enacting laws, it would seem that they would not have left such an important matter to conjecture and inference, and would have said "two-thirds of the membership of the house," rather than "two-thirds of the house." They knew very well what "house" meant, and so they said "two-thirds of the house," instead of making an express limitation, as they did in the other cases mentioned, to a fractional number of the members present.

It cannot be said successfully that the Constitution clearly intends that the two-thirds shall be of all the members of the house. It would seem that what was said by Mr. Justice Brewer is conclusive of the matter, that the exception is—

"in those states where the Constitution provides that a majority of all the members elected to either house shall be necessary for the passage of any bill. No such limitation is found in the federal Constitution, and therefore the general law of such bodies obtains."

One feels one is on firm ground when one stands with such an authority as Judge Cooley, who, in his treatise on Constitutional Limitations (chapter VI, p. 201), says:

"A simple majority of a quorum is sufficient, unless the Constitution establishes some other rule; and where, by the Constitution, a two-thirds or three-fourths vote is made essential to the passage of any particular class of bills, two-thirds or three-fourths of a quorum will be understood, unless the terms employed clearly indicate that this proportion of all the members, or of all those elected, is intended."

See, also, Warehouse v. McIntosh, 1 Ala. App. 407, 56 South. 102; State v. McBride, 4 Mo. 303, 29 Am. Dec. 636; Southworth v. Railroad, 2 Mich. 287; Smith v. Jennings, 67 S. C. 324, 45 S. E. 821; Tucker on the Constitution, vol. 1, p. 327.

It is true that the principles of the Constitution are fundamental and are designed to be permanent. Chief Justice Marshall, in Marbury v. Madison, 1 Cranch, 137, 2 L. Ed. 60.

"The great principle to be sought is to make the changes practicable, but not too easy, to secure due deliberation and caution, and to follow experience, rather than to open a way for experiments suggested by mere speculation or theory." Story on the Constitution, § 1827, citing (section 1830) No. 43 of the Federalist, in which Hamilton and Madison expressed similar views.

In Elliott's Debates, vol. 5, p. 431, Hamilton is reported to have said:

"The national Legislature will be the first to perceive, but will be most sensible to, the necessity of amendments, and also to be empowered, whenever two-thirds of each branch should concur, to call a convention. There could be no danger in giving this power, as the people will finally decide in the case."

Counsel for plaintiff frankly say:

"There was no actual definition anywhere in the Debates, so far as we have discovered, defining just what the term 'two-thirds' meant."

It is a remarkable fact that nothing appears in the Debates on the subject. No doubt "house" was considered, when used in connection with a proposed amendment, to mean what the word, as well understood, meant at that time in connection with the passing of laws by legislative bodies. Men of strong mind and patriotic purpose have entertained the same views as plaintiff, and the question has been raised many times.

In 1861 (36 Cong., 2d Sess., Journal, p. 383) it appeared:

"Mr. Trumbull raised a question of order whether, the joint resolution being a proposition to amend the Constitution of the United States, it did not require an affirmative vote of two-thirds of the members composing the Senate

to pass the same. The President decided that it required an affirmative vote of two-thirds of Senators present only. On appeal, the decision was sustained—yeas, 33; nays, 1."

On February 26, 1869, a Suffrage Amendment to the Constitution was proposed. The Senate voted yeas 39, nays 13. Upon a point of order made by Mr. Davis that, as the Senate consisted of 74 members, a vote of 50 was necessary to constitute two-thirds, Mr. Trumbull said that the same question was raised in Buchanan's administration, when, after a debate, Mr. Breckenridge in the chair, it was voted that the two-thirds required was two-thirds of the Senators present, if a quorum, and thereupon the view of Mr. Trumbull was adopted.

On the joint resolution proposing the amendment providing for the election of Senators May 11, 1899, Mr. Hill called attention to the language of article 5. In ruling upon the point of order the Speaker (Mr. Reed) said:

"The question is one that has been so often decided that it seems hardly necessary to dwell upon it. The provision of the Constitution says 'two-thirds of both houses.' What constitutes a house? A quorum of the membership, a majority, one-half and one more. That is all that is necessary to constitute a house to do all the business that comes before the house. Among the business that comes before the house is the reconsideration of a bill which has been vetoed by the President; another is a proposed amendment to the Constitution; and the practice is uniform in both cases that if a quorum of the house is present the house is constituted, and two-thirds of those voting are sufficient in order to accomplish the object. It has nothing to do with the question of what states are present and represented, or what states are present and vote for it. * * *"

The vote on the resolution was—yeas, 184; nays, 11. Two-thirds of the whole house were not present. There were, at these times, great men and great lawyers in the Senate and in the House, men just as jealous of maintaining to the last degree the integrity of the Constitution as the plaintiff or his counsel or any one can be. They were satisfied that they were proceeding in the way the Constitution provided. If plaintiff is right, the joint resolution proposing the amendment which became the very first amendment to the Constitution had no constitutional sanction.

The court is not sufficiently advised to say how many of the amendments were proposed by resolutions passed by less than two-thirds of the membership of each house; but the joint resolution proposing the Fourteenth Amendment and the joint resolution proposing the Fifteenth Amendment were invalid, if plaintiff is right, and in the innumerable instances in which persons and property have been protected by the courts by virtue of the provisions of those amendments, the courts have had no sanction for their action.

It is argued that, when joint resolutions proposing these amendments were adopted, the 11 Confederate States had seceded, and were not in the Union. But the theory of the North, the theory to which no one held more firmly than Mr. Lincoln, was that the Southern States never were out of the Union. The original purpose of the North in the Civil War was to maintain the integrity of the Union and to compel the Southern States to maintain it. The abolition of slavery was wholly incidental.

There were just as many votes necessary in passing the joint resolution proposing these amendments as when the First Amendment was proposed and the last is now proposed. It is the judgment of this court that two-thirds means two-thirds of a quorum.

[11] 13. But counsel say:

"None of the prior amendments could possibly be affected by the decision of this case, because those prior amendments were ratified on a record which showed a compliance with the Constitution. This necessarily must be presumed. 'Omnia præsumuntur rite et solemniter esse acta.' Those prior amendments are like judgments by default, where a good defense on the facts existed and was not interposed. The judgments have become final, irrevocable, and unreversible, and have every force and effect."

One cannot agree with this. The "record" showing the compliance with the Constitution in those instances is no more solemn and conclusive after adoption by the states than it is before their adoption. If the record can be attacked at all, it can, in the judgment of this court, be attacked after the adoption by the states of the amendment and proceedings had to enforce legislation enacted for the purpose of carrying the amendment into effect.

For the reasons given, the bill will be dismissed.