## UNITED STATES *v.* BALLIN.

**APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF NEW YORK.**

No. 1061.  Argued December 2, 1891. — Decided February 29, 1892.

The provision in Rule XV of the House of Representatives of the fifty-first Congress, that "on the demand of any member, or at the suggestion of the Speaker, the names of members sufficient to make a quorum in the hall of the house who do not vote shall be noted by the clerk and recorded in the journal, and reported to the Speaker with the names of the members voting, and be counted and announced in determining the presence of a quorum to do business," is a constitutional mode of ascertaining the presence of a quorum, empowered to act as the House.

Under the provision in the act of May 9, 1890, 26 Stat. 105, c. 200, the duties on worsted cloths were, by the terms of the act, and irrespective of any action by the Secretary of the Treasury, to be such as were placed on woollen cloths by the act of March 3, 1883.  22 Stat. c. 121, pp. 488, 508.

In July, 1890, the appellees imported into New York certain goods, which they claimed to be dutiable as manufactures of worsted at the rate described in schedule K, of the act of March 3, 1883.  22 Stat. 488, 509, c. 121.  The collector assessed them at the rate prescribed in that schedule as manufactures of wool.  22 Stat. 488, 508, c. 121.  This he did by

reason of an act claimed to have been passed by Congress, in 1890, as follows:

"Chap. 200.   An act providing for the classification of worsted cloths as woollens.

"Be it enacted, etc., That the Secretary of the Treasury be, and he hereby is, authorized and directed to classify as woollen cloths all imports of worsted cloth, whether known under the name of worsted cloth or under the names of worsteds or diagonals or otherwise.

"Approved, May 9, 1890."   26 Stat. 105, c. 200.

The board of general appraisers found these facts:

"(1.) That the goods in question are worsted, and not woollen goods.

"(2.) That the Secretary of the Treasury never examined or classified the goods in question.

"(3.) That the journal of the House of Representatives shows the facts attending the passage of the act. of May 9, 1890, thus:

"The Speaker laid before the house the bill of the house (H. R. 9548) providing for the classification of worsted cloths as woollens, coming over from last night as unfinished business, with the previous question, and the yeas and nays ordered.

"The house having proceeded to the consideration and the question being put,

"Shall the bill pass?

"There appeared

"Yeas — 138.

"Nays — 0.

"Not voting — 189.

"The said roll-call having been recapitulated, the Speaker announced, from a list noted and furnished by the clerk, at the suggestion of the Speaker, the following-named members as present in the hall when their names were called, and not voting, viz.:

[Here follows an alphabetical list of the names of seventy-four members.]

"The Speaker thereupon stated that the said members

present and refusing to vote, (74 in number,) together with those recorded as voting, (138 in number,) showed a total of 212 members present, constituting a quorum present to do business: and, that the yeas being 138 and the nays none, the said bill was passed."

On appeal, the Circuit Court of the United States for the Southern District of New York sustained the claim of the importers and reversed the decision of the collector, 45 Fed. Rep. 170, from which judgment the United States appealed to this court.

*Mr. Attorney General* and *Mr. Solicitor General* for appellant.

*Mr. Edwin B. Smith* for appellees.  *Mr. Stephen G. Clarke* was with him on the brief.

MR. JUSTICE BREWER delivered the opinion of the court.

Two questions only are presented: first, was the act of May 9, 1890, legally passed; and, second, what is its meaning? The first is the important question. The enrolled bill is found in the proper office, that of the Secretary of State, authenticated and approved in the customary and legal form. There is nothing on the face of it to suggest any invalidity. Is there anything in the facts disclosed by the journal of the house, as found by the general appraisers, which vitiates it? We are not unmindful of the general observations found in *Gardner* v. *The Collector*, 6 Wall. 499, 511, "that whenever a question arises in a court of law of the existence of a statute, or of the time when a statute took effect, or of the precise terms of a statute, the judges who are called upon to decide it have a right to resort to any source of information which in its nature is capable of conveying to the judicial mind a clear and satisfactory answer to such question; always seeking first for that which in its nature is most appropriate, unless the positive law has enacted a different rule." And we have at the present term, in the case of *Field* v. *Clark*, 143 U. S. 649, had occasion to consider the subject of an appeal to the

journal in a disputed matter of this nature. It is unnecessary to add anything here to that general discussion. The Constitution (Article 1, section 5) provides that "each house shall keep a journal of its proceedings;" and that "the yeas and nays of the members of either house on any question shall, at the desire of one-fifth of those present, be entered on the journal." Assuming that by reason of this latter clause reference may be had to the journal, to see whether the yeas and nays were ordered, and if so, what was the vote disclosed thereby; and assuming, though without deciding, that the facts which the Constitution requires to be placed on the journal may be appealed to on the question whether a law has been legally enacted, yet if reference may be had to such journal, it must be assumed to speak the truth. It cannot be that we can refer to the journal for the purpose of impeaching a statute properly authenticated and approved, and then supplement and strengthen that impeachment by parol evidence that the facts stated on the journal are not true, or that other facts existed which, if stated on the journal, would give force to the impeachment. If it be suggested that the Speaker might have made a mistake as to some one or more of these seventy-four members, or that the clerk may have falsified the journal in entering therein a record of their presence, it is equally possible that in reference to a roll-call and the yeas and nays there should be a like mistake or falsification. The possibility of such inaccuracy or falsehood only suggests the unreliability of the evidence and the danger of appealing to it to overthrow that furnished by the bill enrolled and authenticated by the signatures of the presiding officers of the two houses and the President of the United States. The facts, then, as appearing from this journal, are that at the time of the roll-call there were present 212 members of the house, more than a quorum; and that 138 voted in favor of the bill, which was a majority of those present. The Constitution, in the same section, provides, that "each house may determine the rules of its proceedings." It appears that in pursuance of this authority the house had, prior to that day, passed this as one of its rules:

" Rule XV

" 3. On the demand of any member, or at the suggestion of the Speaker, the names of members sufficient to make a quorum in the hall of the house who do not vote shall be noted by the clerk and recorded in the journal, and reported to the Speaker with the names of the members voting, and be counted and announced in determining the presence of a quorum to do business." (Ho. Journal, 230, Feb. 14, 1890.)

The action taken was in direct compliance with this rule. The question, therefore, is as to the validity of this rule, and not what methods the Speaker may of his own motion resort to for determining the presence of a quorum, nor what matters the Speaker or clerk may of their own volition place upon the journal. Neither do the advantages or disadvantages, the wisdom or folly, of such a rule present any matters for judicial consideration. With the courts the question is only one of power. The Constitution empowers each house to determine its rules of proceedings. It may not by its rules ignore constitutional restraints or violate fundamental rights, and there should be a reasonable relation between the mode or method of proceeding established by the rule and the result which is sought to be attained. But within these limitations all matters of method are open to the determination of the house, and it is no impeachment of the rule to say that some other way would be better, more accurate or even more just. It is no objection to the validity of a rule that a different one has been prescribed and in force for a length of time. The power to make rules is not one which once exercised is exhausted. It is a continuous power, always subject to be exercised by the house, and within the limitations suggested, absolute and beyond the challenge of any other body or tribunal.

The Constitution provides that " a majority of each [house] shall constitute a quorum to do business." In other words, when a majority are present the house is in a position to do business. Its capacity to transact business is then established, created by the mere presence of a majority, and does not depend upon the disposition or assent or action of any single

member or fraction of the majority present. All that the Constitution requires is the presence of a majority, and when that majority are present the power of the house arises.

But how shall the presence of a majority be determined? The Constitution has prescribed no method of making this determination, and it is therefore within the competency of the house to prescribe any method which shall be reasonably certain to ascertain the fact. It may prescribe answer to roll-call as the only method of determination; or require the passage of members between tellers, and their count as the sole test; or the count of the Speaker or the clerk, and an announcement from the desk of the names of those who are present. Any one of these methods, it must be conceded, is reasonably certain of ascertaining the fact, and as there is no constitutional method prescribed, and no constitutional inhibition of any of those, and no violation of fundamental rights in any, it follows that the house may adopt either or all, or it may provide for a combination of any two of the methods. That was done by the rule in question; and all that that rule attempts to do is to prescribe a method for ascertaining the presence of a majority, and thus establishing the fact that the house is in a condition to transact business.

As appears from the journal, at the time this bill passed the house there was present a majority, a quorum, and the house was authorized to transact any and all business. It was in a condition to act on the bill if it desired. The other branch of the question is, whether, a quorum being present, the bill received a sufficient number of votes; and here the general rule of all parliamentary bodies is that, when a quorum is present, the act of a majority of the quorum is the act of the body. This has been the rule for all time, except so far as in any given case the terms of the organic act under which the body is assembled have prescribed specific limitations. As, for instance, in those States where the constitution provides that a majority of all the members elected to either house shall be necessary for the passage of any bill. No such limitation is found in the Federal Constitution, and therefore the general law of such bodies obtains.

It is true that most of the decisions touching. this question have been in respect to the actions of trustees and directors of a private corporation, or of the minor legislative bodies which represent and act for cities and other municipal corporations; but the principle is the same. The two houses of Congress are legislative bodies representing larger constituencies. Power is not vested in any one individual, but in the aggregate of the members who compose the body, and its action is not the action of any separate member or number of members, but the action of the body as a whole; and the question which has over and over again been raised is, what is necessary to constitute the official action of this legislative and representative body. In *Rex* v. *Monday,* 2 Cowp. 530, 538, Lord Mansfield said : " I will take it for granted that a *majority* of the mayor and aldermen for the time being are sufficient to constitute the assembly. And the fact found by the special verdict is that the majority of those in being did meet. When the assembly are *duly met* I take it to be clear law that the corporate act may be done by the majority of those who have once regularly constituted the meeting." In 5 Dane's Abridgment, p. 150, the rule is thus stated : " When a corporation is composed of a definite number; and an integral part of it is required to vote in an election, *a majority of such integral definite part must attend, aliter* there is no elective assembly, but a majority of those *present* when legally met will bind the rest." In 1 Dillon's Municipal Corporations, (fourth edition,) section 283, the rule is thus stated : " And, as a general rule, it may be stated that not only where the corporate power resides in a select body, as a city council, but where it has been *delegated to a committee or to agents,* then, in the absence of special provisions otherwise, a *minority* of the select body, or of the committee or agents, are powerless to bind the majority or do any valid act. If all the members of the select body or committee, or if all the agents are assembled, or if *all* have been duly notified, and the minority refuse or neglect to meet with the others, a majority of those present may act, provided those present constitute a majority of the whole number. In other words, in such case, a major part of the

whole is necessary to constitute a quorum, and a majority of the quorum may act. If the major part withdraw so as to leave no quorum, the power of the minority to act is, in general, considered to cease." This declaration has been quoted approvingly by this court in the case of *Brown* v. *District of Columbia*, 127 U. S. 579, 586. In 2 Kent's Commentaries, 293, the author draws this distinction between what is necessary to a meeting of a representative, and to that of a constituent body: "There is a distinction taken between a corporate act to be done by a select and definite body as by a board of directors, and one to be performed by the constituent members. In the latter case, a majority of those who appear may act; but in the former, a majority of the definite body must be present, and then a majority of the quorum may decide." See also *Ex parte Willcocks*, 7 Cowen, 402; *Commonwealth* v. *Green*, 4 Wharton, 531; *State* v. *Green*, 37 Ohio St. 227; *Launtz* v. *The People*, 113 Illinois, 137; *Gas Co.* v. *Rushville*, 121 Indiana, 206; *Gosling* v. *Veley*, 7 Q. B. 406; *S. C.* 4 H. L. Cas. 679.

In *State* v. *Deliesseline*, 1 McCord, 52, it is said: "For, according to the principle of all the cases referred to, a quorum possesses all the powers of the whole body; a majority of which quorum must, of course, govern. . . . The constitutions of this State and the United States declare that a majority shall be a quorum to do business; but a majority of that quorum are sufficient to decide the most important question."

In *Wells* v. *Rahway Co.*, 4 C. E. Green (19 N. J. Eq.) 402, we find this language: "A majority of the directors of a corporation, in the absence of any regulation in the charter, is a quorum, and a majority of such quorum when convened can do any act within the power of the directors."

And in *Attorney General* v. *Shepard*, 62 N. H. 383, 384, the question was whether an amendment to a city charter had been properly adopted by the board of aldermen. All the members of the board were present but one. The ordinance was duly read and put to a vote, and declared by the chair to be passed. The yeas and nays were then called; three voted in the affirmative, three refused to vote, and the chair declared

the ordinance passed. The court held, Chief Justice Doe delivering the opinion, that the amendment to the charter was legally adopted by the board of aldermen. He said: "The exercise of law-making power is not stopped by the mere silence and inaction of some of the law-makers who are present. An arbitrary, technical, and exclusive method of ascertaining whether a quorum is present, operating to prevent the performance of official duty and obstruct the business of government, is no part of our common law. The statute requiring the presence of four aldermen does not mean that in the presence of four a majority of the votes cast may not be enough. The journal properly shows how many members were there when the vote was taken by yeas and nays; there was no difficulty in ascertaining and recording the fact; and the requirement of a quorum at that time was not intended to furnish a means of suspending the legislative power and duty of a quorum. No illegality appears in the adoption of the amendment."

Summing up this matter, this law is found in the Secretary of State's office, properly authenticated. If we appeal to the journal of the house, we find that a majority of its members were present when the bill passed, a majority creating by the Constitution a quorum, with authority to act upon any measure; that the presence of that quorum was determined in accordance with a valid rule theretofore adopted by the house; and that of that quorum a majority voted in favor of the bill. It therefore legally passed the house, and the law as found in the office of the Secretary of State is beyond challenge.

With reference to the other question: The opinion of the Circuit Court seemed to be, that the act cast upon the Secretary of the Treasury a special duty of classification in all cases of the importation of worsted cloths, and that unless he so acted in any particular case the duty remained as it was prior to the passage of the act. We quote its language: "This act, however, proceeds upon an entirely novel theory. It provides expressly for a classification in direct non-conformity to the facts. It authorizes an officer of the government who may find an import to be in fact an article which under the tariff

laws pays one rate of duty to call it something else, which it is not, in order to enable the revenue officers to levy upon it a rate of duty which that other article, which it is not, pays. . . . . I do not mean by that to suggest for one moment that under the phraseology of this act it is the duty of the Secretary of the Treasury to himself examine the packages of goods, to handle or see their contents; but, having been informed and advised as to the facts in the same way in which he is informed and advised upon any facts upon which he is required to pass, by the examination and report of such trustworthy subordinates as he may select, the final classification of the particular articles is one to be made by him."

We do not so construe the act. We understand it rather as a declaration by Congress as to the construction to be placed upon that portion of the act of 1883 which refers to imported woollen cloths. It was an act suggested by the contest then pending in the courts, and which was finally decided adversely to the government in the case of *Seeberger* v. *Cahn,* 137 U. S. 95, in which it was held by this court that "cloths popularly known as 'diagonals,' and known in trade as 'worsteds,' and composed mainly of worsted, but with a small proportion of shoddy and of cotton, are subject to duty as a manufacture of worsted, and not as a manufacture of wool, under the act of March 3, 1883, c. 121." The form of expression used in the act may be novel, but the intent of Congress is quite clear. Recognizing the fact that the Secretary of the Treasury is the head of the financial department of the government, that to him, as its chief administrative official, is given the supervision of the tariff and all the collections thereunder, it directs him to classify all worsted cloths as woollen cloths, and it gives to him no discretion. He may not classify some worsteds as woollens and others as not. There is given no choice or selection, but it is the imperative direction of Congress to him, as the chief administrative officer in the collection of duties, to place all worsted cloths, by whatever name properly known or known to the trade, within the category of woollen cloths, and, of course, if placed within that category, or using the familiar language of the tariff, if "classified as woollen cloths,"

subject to the duty imposed on such cloths. If action were necessary by the Secretary of the Treasury to put this act into force, which was not as we think, such action was taken by the circular letter of May 13, 1890, from the Treasury Department to all customs officers, publishing the act for the information and guidance of the public.

Our conclusion, therefore, is that the act was legally passed; and that by its own terms, and irrespective of any action by the Secretary of the Treasury, the duties on worsted cloths were to be such as were placed by the act of 1883 on woollen cloths.

*The judgment of the Circuit Court will be reversed, and the case remanded for further proceedings, in accordance with this opinion.*