Adam Clayton **POWELL**, Jr., et al.,
Plaintiffs,

v.

John W. **McCORMACK** et al., Defendants.

Civ. A. No. 559–67.

United States District Court
District of Columbia.

April 7, 1967.

Certiorari Denied May 29, 1967.

See 87 S.Ct. 2056.

Frank D. Reeves, Herbert O. Reid, Sr., Jean Camper Cahn, Washington, D. C., and Robert L. Carter, Hubert T. Delany, Arthur Kinoy, William M. Kunstler, and Henry R. Williams, New York City, for plaintiffs.

Bruce Bromley, John R. Hupper, Thomas D. Barr, Victor M. Earle, III, Jay E. Gerber, New York City, and Lloyd N. Cutler, Louis F. Oberdorfer, Max O. Truitt, Jr., Timothy B. Dyk, and James S. Campbell, Washington, D. C., for defendants.

## OPINION

HART, District Judge.

This is an action for injunctive relief, mandamus, and declaratory judgment brought by Adam Clayton Powell, Jr., and thirteen electors of New York's 18th Congressional District. Defendants are Members and Officials of the House of Representatives of the 90th Congress sued individually, in their official positions, and as representatives of all House Members. The complaint alleges that House Resolution 278, passed March 1, 1967, by a vote of 307 to 116, improperly excluded Powell from House membership in violation of the plaintiffs' Constitutional rights.

Plaintiffs assert that Powell meets the qualifications of age, citizenship, and inhabitancy specified in Article I, Section 2, Clause 2 of the Constitution (and holds a valid certificate of election) and that under Article I, Section 5, Clause 1, these are the exclusive tests for admission to House membership. In addition, plaintiffs allege that House Resolution 278 subjects them to discrimination based upon race and color in violation of the 5th, 13th, and 15th Amendments to the Constitution; that the Resolution constitutes a bill of attainder, an ex post facto law, and cruel and unusual punishment; and that adoption of the Resolution violated procedural due process and the 6th Amendment.

## APPLICATION FOR A THREE-JUDGE COURT

28 U.S.C. § 2282 provides as follows:

"An interlocutory or permanent injunction restraining the enforcement, operation or execution of any Act of Congress for repugnance to the Constitution of the United States shall not be granted by any district court or judge thereof unless the application therefor is heard and determined by a district court of three judges under section 2284 of this title."

It is plain by its terms that the foregoing section applies to an "Act of Congress" only. The history of the statute is wholly consistent with this interpretation. The matter complained of here, House Resolution 278, is patently not an Act of Congress. It follows, therefore, that convening a statutory three-judge court to consider the issues raised by the complaint is neither required nor authorized.

The question whether a joint resolution of Congress, approved by the President, would be an "Act of Congress" within the meaning of 28 U.S.C. § 2282 is not before this Court and, therefore, is not decided. In any event, the decision of the Court on the motion to dismiss would moot the question of the right of plaintiffs to a three-judge court in the case at bar.

## MOTION TO DISMISS—JURISDICTION

The defendants have moved under Rule 12(b) of the Federal Rules of Civil Procedure to dismiss the complaint for the following reasons:

1. This Court does not have jurisdiction over the subject matter of this action;

2. This Court does not have jurisdiction over the persons of the defendants;

3. The complaint fails to state a claim upon which relief may be granted.

In their brief the defendants have broken down the three contentions for dismissal set forth above into a number of sub-heads. Each of these sub-heads has been briefed and argued with learning and care by both sides.

### 1. *Speech or Debate Clause*

In the English Bill of Rights ("An Act Declaring the Rights and Liberties of the Subject, and Settling the Succession of the Crown; passed in the 1st year of William and Mary, A.D. 1689") it was provided:

"That the freedom of speech, and debates or proceedings in Parliament, ought not to be impeached or questioned in any *court* or place out of Parliament." [Emphasis added]

This provision was carried forward in our Constitution, Article I, Section 6, Clause 1, in the following language:

" * * *; and for any Speech or Debate in either House, they [The Senators and Representatives] shall not be questioned in *any other Place*." [Emphasis added]

The above provision of the Constitution may well bar jurisdiction of the Court in the matter here in controversy, but the Court does not bottom its decision on this point.

### 2. *Right of the House of Representatives to Determine the Qualifications of Its Own Members*

The question of whether there is an absolute right in the House of Representatives to determine the qualifications of its own members will not be touched on herein.

Let us consider whether the House has correctly interpreted the word "qualifications" in Article I, Section 5, Clause 1 of the Constitution which provides:

"Each House shall be the Judge of the Elections, Returns, and *Qualifications* of its own Members, and a Majority of each shall constitute a Quorum to do Business * * *." [Emphasis added]

It can be argued with great force and conviction that the word "qualifications" covers any cause that the Members of the House, by majority vote, choose it to cover, including:

1. Contempt of the Courts of New York;

2. Improper maintenance of an employee on a Member's clerk-hire payroll;

3. As a Member and committee chairman, permitting and participating in improper expenditure of government funds for private purposes; and

4. Acting in a manner contemptuous of the House and unworthy of a Member of the House of Representatives.

On the other hand, it can be argued with force and conviction that in light of Article I, Section 5, Clause 2 of our Constitution, which reads:

"Each House may determine the Rules of its Proceedings, punish its Members for disorderly Behavior, and, with the Concurrence of two thirds, expel a Member."

the word "qualifications" in Article I, Section 5, Clause 1 is limited to age, length of citizenship, and inhabitancy in the state from which a person shall be chosen, as provided in Article I, Section 2, Clause 2, plus a valid election certificate.

The Court deems it unnecessary to resolve this question in view of its disposition of the matter of jurisdiction under the doctrine of separation of powers.

### 3. *Separation of Powers*

[3] In this Court's view of the case, the complaint and the relief prayed for raise one issue of such transcendent importance that all other issues in the case pale into insignificance. This issue constitutes a "political question.". The question facing the Court may be simply stated as follows: Would consideration of the complaint on the merits and granting any of the requested relief violate the doctrine of "separation of powers"?

At first blush it might be thought that the Supreme Court answered this question in the negative in Bond v. Floyd, 385 U.S. 116, 87 S.Ct. 339, 17 L.Ed.2d 235 (1966). In that case the Supreme Court invalidated a resolution of one branch of the Georgia Legislature refusing to seat Bond, holding that the resolution violated Bond's right to freedom of speech guaranteed by the First Amendment of the federal Constitution. The *Bond* case did not present a "political question" nor did it raise the question of separation of powers between coordinate branches of government.

The Supreme Court stated concisely when a "political question," which includes the doctrine of separation of powers, arises, and when it does not arise, in the case of Baker v. Carr, 369 U.S. 186, 210, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), when the Court said:

"[I]n the * * * 'political question' cases, it is the relationship between the judiciary and the coordinate branches of the Federal Government, and not the federal judiciary's relationship to the States, which gives rise to the 'political question.'

" * * * The nonjusticiability of a political question is primarily a function of the separation of powers." 369 U.S. at 210, 82 S.Ct. at 706.

As to the precise issue which I deem to be raised here, there are no cases directly in point. This Court has not found a case nor has any been cited to it where the complaint and the relief prayed therein have posed to the Court with such stark clarity the question of separation of powers between the Legislature, as represented by the House of Representatives of the United States, and the Federal Judiciary. The following cases may be said to touch on the point but each of them is easily distinguishable on its facts:

Marbury v. Madison, 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803); Luther v. Borden, 48 U.S. (7 Howard) 1, 12 L.Ed. 581 (1849); State of Mississippi v. Johnson, 71 U.S. (4 Wall.) 475, 18 L.Ed. 437 (1867); Kilbourn v. Thompson, 103 U.S. 168, 26 L.Ed. 377 (1880); United States v. Ballin, 144 U.S. 1, 12 S.Ct. 507, 36 L.Ed. 321 (1892); In re Chapman, 166 U.S. 661, 17 S.Ct. 677, 41 L.Ed. 1154 (1897); Com. of Massachusetts v. Mellon, 262 U.S. 447, 43 S.Ct. 597, 67 L.Ed. 1078 (1923); Springer v. Gov-

ernment of Philippine Islands, 277 U.S. 189, 48 S.Ct. 480, 72 L.Ed. 845 (1928); Barry v. United States ex rel. Cunningham, 279 U.S. 597, 49 S.Ct. 452, 73 L.Ed. 867 (1929); Bell v. Hood, 327 U.S. 678, 66 S.Ct. 773, 90 L.Ed. 939 (1946); Colegrove v. Green, 328 U.S. 549, 66 S.Ct. 1198, 90 L.Ed. 1432 (1946); Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1952); United States v. Johnscn, 383 U.S. 169, 86 S.Ct. 749, 15 L.Ed.2d 681 (1966); Hearst v. Black, 66 App.D.C. 313, 87 F.2d 68 (1936); Sevilla v. Elizalde, 72 App.D.C. 108, 112 F.2d 29 (1940); Pauling v. Eastland, 109 U.S.App.D.C. 342, 288 F.2d 126, cert. denied, 364 U.S. 900, 81 S.Ct. 233, 5 L.Ed.2d 194 (1960); Reif v. Barrett, 355 Ill. 104, 188 N.E. 889 (1933); Peabody v. School Committee of City of Boston, 115 Mass. 383 (1874); People ex rel. Drake v. Mahaney, 13 Mich. 481 (1865); State ex rel. Boulware v. Porter, 55 Mont. 471, 178 P. 832 (1919); Brown v. Lamprey, 106 N.H. 121, 206 A.2d 493 (1965).

Let us review briefly, and with a broad brush, the emergence of the doctrine of separation of powers as a principle of free government and the extent to which the doctrine had developed at the time our forefathers prepared the Constitution in 1787 for adoption by the people.

When the doctrine began to bud in ancient Greece, separation of powers referred to the division of authority between the high and the low; between the king, the aristocracy, and the masses; and between the executive and the legislature. To Solon (638?–559 B.C.), the doctrine meant increasing the power of the poor while balancing this power with aristocratic councils and magistrates. Thucydides (471?–400? B.C.) praised a fusion government of the high and the low. Plato (427?–347 B.C.) saw the need for wise aristocrats or kings, and the Statesmen.

Aristotle (384–322 B.C.) contributed the first statement of the doctrine as we now conceive it. He described government as divided into three parts—deliberators, magistrates, and judicial functionaries.

Polybius (205?–125? B.C.) said the Roman Republic was at its best when it combined democratic, artistocratic, and royal elements. Cicero (106–43 B.C.) and Machiavelli (1469–1527) praised government in which all the elements were combined.

John Locke (1632–1704), in order to prevent tyranny, would divide the government between two organs, the executive and the legislative.

Montesquieu (1689–1755) stated the doctrine as it was conceived in the early 18th century as follows:

"The political liberty of the subject is a tranquility of mind arising from the opinion each person has of his safety. In order to have this liberty, it is requisite the government be so constituted as one man need not be afraid of another.

"When the legislative and executive powers are united in the same person, or in the same body of magistrates, there can be no liberty; because apprehensions may arise, lest the same monarch or senate should enact tyrannical laws, to execute them in a tyrannical manner.

"Again, there is no liberty, if the judiciary power be not separated from the legislative and executive. Were it joined with the legislative, the life and liberty of the subject would be exposed to arbitrary control; for the judge would be then the legislator. Were it joined to the executive power, the judge might behave with violence and oppression.

"There would be an end of everything, were the same man, or the same body, whether of the nobles or of the people, to exercise those three powers, that of enacting laws, that of executing the public resolutions, and of trying the causes of individuals." Montesquieu, The Spirit of the Laws, 154 (6th Ed. 1792).

However, Montesquieu thought the judiciary of little importance and said at p. 157, supra:

"Of the three powers above-mentioned, the judiciary is in some measure next to nothing: there remain therefore only two; and as these have need of a regulating power to moderate them, the part of the legislative body composed of the nobility, is extremely proper for this purpose."

It remained for Blackstone (1723–1780) to express the doctrine as it reached full development with the addition of a strong, independent judiciary into the trefoil shield of freedom, a government separated into three parts, the legislative, the executive and the judiciary:

"It is probable, and almost certain, that in very early times, before our Constitution arrived at its full perfection, our kings, in person, often heard and determined causes between party and party. But at present, by the long and uniform usage of many ages, our kings have delegated their whole judicial power to the judges of their several courts; which are the grand depositaries of the fundamental laws of the kingdom, and have gained a known and stated jurisdiction, regulated by certain and established rules, which the crown itself can not now alter but by act of Parliament. And, in order to maintain both the dignity and independence of the judges in the superior courts, it is enacted by the statute 13 W. III., c. 2, that their commissions shall be made (not, as formerly, *durante bene placito,* but) *quamdieu bene se gesserint,* and their salaries ascertained and established, but that it may be lawful to remove them on the address of both houses of Parliament. And now, by the noble improvements of that law in the statute of 1 Geo. III., c. 23, enacted at the earnest recommendation of the king himself from the throne, the judges are continued in their offices during their good behavior, notwithstanding any demise of the crown (which was formerly held immediately to vacate their seats), and their full salaries are absolutely secured to them during the continuance of their commissions; his majesty having been pleased to declare that 'he looked upon the independence and uprightness of the judges as essential to the impartial administration of justice, as one of the best securities of the rights and liberties of his subjects, and as most conducive to the honor of the crown.'

\* \* \* \* \* \*

"In this distinct and separate existence of the judicial power in a peculiar body of men, nominated indeed, but not removable at pleasure, by the crown, consists one main preservative of the public liberty; which can not subsist long in any state, unless the administration of common justice be in some degree separated from the legislative and also from the executive power. Were it joined with the legislative, the life, liberty, and property of the subject would be in the hands of arbitrary judges, whose decisions would be then regulated only by their own opinions, and not by any fundamental principles of law; which, though legislators may depart from, yet judges are bound to observe. Were it joined with the executive, this union might soon be an overbalance for the legislative. For which reason, by the statute of 16 Car. I., c. 10, which abolished the Court of Star Chamber, effectual care is taken to remove all judicial power out of the hands of the king's privy council, who, as then was evident from recent instances, might soon be inclined to pronounce that for law which was most agreeable to the prince or his officers. Nothing, therefore, is more to be avoided, in a free constitution, than uniting the provinces of a judge and a minister of state." 1 Blackstone, Commentaries on the Laws of England, 267–68, 269 (21st Amer.Ed.1854).

By the time the members of the Constitutional Convention met in 1787 the doctrine of separation of powers between the legislative, the executive, and the ju-

diciary had become an axiom of free government.

In the Federalist papers, which appeared in 1787 and 1788 in defense of the proposed federal Constitution, Madison was assigned the task of explaining the principle of separation of powers and proving that the framers had not disregarded it. Madison did not argue that the principle was a good one. He started with the premise that it was good and that it was a necessary doctrine to be included in the Constitution to insure a republic that guaranteed freedom to its people; this premise was accepted by the people to whom his arguments were addressed.

In The Federalist, No. 47, published January 30, 1788, Madison said:

"One of the principal objections inculcated by the more respectable adversaries to the constitution, is its supposed violation of the political maxim, that the legislative, executive and judiciary departments ought to be separate and distinct. In the structure of the federal government, no regard, it is said, seems to have been paid to this essential precaution in favor of liberty. The several departments of power are distributed and blended in such a manner, as at once to destroy all symmetry and beauty of form; and to expose some of the essential parts of the edifice to the danger of being crushed by the disproportionate weight of other parts.

"No political truth is certainly of greater intrinsic value or is stamped with the authority of more enlightened patrons of liberty than that on which the objection is founded. The accumulation of all powers legislative, executive and judiciary in the same hands, whether of one, a few or many, and whether hereditary, self appointed, or elective, may justly be pronounced the very definition of tyranny. Were the federal constitution therefore really chargeable with the accumulation of powers or with a mixture of powers having a dangerous tendency to such an accumulation, no

further arguments would be necessary to inspire a universal reprobation of the system. I persuade myself however, that it will be made apparent to every one, that the charge cannot be supported, and that the maxim on which it relies, has been totally misconceived and misapplied. In order to form correct ideas on this important subject, it will be proper to investigate the sense, in which the preservation of liberty requires, that the three great departments of power should be separate and distinct." The Federalist, No. 47, 323 (Cooke Ed. 1961) (Madison).

James Wilson, who was influential in obtaining the adoption of the Constitution, said:

"Though the foregoing great powers—legislative, executive, and judicial—are all necessary to a good government; yet it is of the last importance, that each of them be preserved distinct, and unmingled, in the exercise of its separate powers, with either or with both of the others. Here every degree of confusion in the plan will produce a corresponding degree of interference, opposition, combination, or perplexity in its execution." Wilson, Works, 407 (1804).

The doctrine of separation of powers, which developed over a period of two millennia, is firmly imbedded in the warp and woof of our Constitution.

It is the conclusion of this Court that for the Court to decide this case on the merits and to grant any of the relief prayed for in the complaint would constitute a clear violation of the doctrine of separation of powers. For this Court to order any member of the House of Representatives of the United States, any officer of the House, or any employee of the House to do or not to do an act related to the organization or membership of that House would be for the Court to crash through a political thicket into political quicksand.

This Court holds, therefore, that by reason of the doctrine of separation of

powers, this Court has no jurisdiction in this matter.

The Court rules as follows:

1. The application for a three-judge Court is denied.

2. The complaint is dismissed for want of jurisdiction of the subject matter in this Court.

3. The prayer for a preliminary injunction falls with the dismissal of the complaint.