**RONALD H. BROWN CHARTER SCHOOL, Petitioner**

v.

**HARRISBURG CITY SCHOOL DISTRICT, Respondent.**

Commonwealth Court of Pennsylvania.

Argued June 14, 2007.

Filed July 5, 2007.

David Lanza, Camp Hill, for petitioner.

Allison S. Petersen, Huntingdon Valley, for respondent.

1. Act of March 10, 1949, P.L. 30, § 1701–A, *as added by* the Act of June 19, 1997, P.L. 225, 24 P.S. § 17–1701–A.

2. Section 1720–A of the Charter School Law, 24 P.S. § 17–1720–A provides: "The charter shall be for a period of no less than three (3) nor more than five (5) years and may be renewed for five (5) year periods upon reauthorization by the local board of school directors of a school district or the appeal board."

3. The Board of Control also found violations of material conditions of the charter relating to the distance-learning program and the mathematics curriculum. It further found that there was a failure to implement primary care teaching; a failure to provide an ade-

BEFORE: PELLEGRINI, Judge, COHN JUBELIRER, Judge, and SIMPSON, Judge.

OPINION BY Judge PELLEGRINI.

The Ronald H. Brown Charter School (School) appeals from an order of the State Charter School Appeal Board (Board) upholding the decision of the Harrisburg City School District (School District) denying renewal of the School's charter for violations of the charter.

The School was granted a five-year charter in January 2000 and was operating as a Pennsylvania Charter School pursuant to Section 1701–A of Act 22 of 1997 (the Charter School Law),[1] 24 P.S. § 17–1701–A. On November 30, 2004, the School applied to the School District to renew its charter.[2] Three days of hearings were held to determine if the charter should be renewed. On September 12, 2005, the Board of Control of the School District determined that the School's charter should not be renewed based on its failure to comply with, among other violations,[3] the financial and performance standard requirements pursuant to Section 1729–A(a)(1)–(4) of the Charter School Law, 24 P.S. § 17–1729–A(a)(1)–(4).[4]

quate number of computers for the students; and a failure to provide a library as it had described it would and had alleged it had done. There were also violations of the Charter School Law and other laws, regulations and guidelines. None of these violations were appealed by the School to the Board or to this Court and are not before us now for consideration.

4. Section 1729–A of the Charter School Law, 24 P.S. § 17–1729–A, states as follows:

(a) During the term of the charter or at the end of the term of the charter, the local board of school directors may choose to revoke or not to renew the charter based on any of the following:

(1) One or more material violations of any of the conditions, standards or proce-

On October 14, 2005, the School appealed to the Board which was comprised of seven members. However, while the appeal was pending before the Board, there were two vacancies on the Board leaving only five Board members. On May 23, 2006, only four of the five Board members were present constituting a quorum, one of those members having previously recused, leaving three members of the Board to vote on the School's appeal. Those three remaining members voted unanimously to affirm the Board of Control's revocation of the School's charter. Based on that vote, a written order with findings of fact and conclusions of law was entered on July 19, 2006, denying the School's appeal and affirming the decision of the School District. This appeal followed.[5]

## I.

█ On appeal,[6] the School argues that the Board's decision is invalid because Section 1721–A(b) of the Charter School Law, 24 P.S. § 17–1721–A(b), requires that four members, not three members, were needed to vote on its renewal petition. That section provides:

A majority of the members of the appeal board shall constitute a quorum, and a majority of the members of the appeal

board shall have authority to act upon any matter properly before the appeal board.

The School District responded stating that at common law, once a quorum was established, only a majority of the quorum was needed to act on a matter. Because there was an even number under the School's interpretation as a quorum of four members were present, the question then is whether this provision requires a majority of the members present to vote or whether a majority of the members of the Board at full strength—seven—is required to take action.

Unless there is contrary legislative intent to the common law rule requiring a vote of a full body to be valid, all that is needed is a majority of a quorum to take action; not that all the members of the Board must vote who are authorized but are not seated. In *DiGiacinto v. City of Allentown*, 486 Pa. 436, 406 A.2d 520 (1979), our Supreme Court explained the common law rule and the policy reasons behind the rule as follows:

In determining the number of votes necessary for a deliberative body to take official action, Pennsylvania follows the common law rule. *Stoltz v. McConnon*, 473 Pa. 157, 373 A.2d 1096 (1977);

dures contained in the written charter signed pursuant to section 1720–A.

(2) Failure to meet the requirements for student performance set forth in 22 Pa. Code Ch. 5 (relating to curriculum) or subsequent regulations promulgated to replace 22 Pa.Code Ch. 5 or failure to meet any performance standard set forth in the written charter signed pursuant to section 1716–A.

(3) Failure to meet generally accepted standards of fiscal management or audit requirements.

(4) Violation of provisions of this article.

**5.** The School filed a petition for review with this Court appealing the Board's denial of its charter renewal. It also requested a superse-

deas seeking an extension of its charter throughout the pending appeal so that it could remain open and continue to enroll students from their respective school districts for the 2006–2007 school year. We denied the School's request for a supersedeas finding that it was unlikely that the School's claim—that the Board's vote was not valid—would be successful on the merits.

**6.** Our scope of review from the Board's decision is limited to whether constitutional rights were violated, whether errors of law were committed or whether the decision is not supported by substantial evidence. *Carbondale Area School District v. Fell Charter School*, 829 A.2d 400 (Pa.Cmwlth.2003).

*Munce v. O'Hara,* 340 Pa. 209, 16 A.2d 532 (1940); *see also Commonwealth of Pennsylvania ex rel. Zimmerman v. Kleiman,* 485 Pa. 421, 402 A.2d 1343 (1979); *Federal Trade Commission v. Flotill Products,* 389 U.S. 179, 88 S.Ct. 401, 19 L.Ed.2d 398 (1967). Under the common law rule so long as a quorum is present at a meeting, all that is required is that the highest vote be equal to a majority of the quorum number, even though the highest vote constitutes only a plurality of all the legal votes cast. This is true even if more than the quorum number is present at the meeting. For example, if there are seven members of a body and four of those members constitute a quorum and attend a meeting, a majority of the four, which would be three, is necessary to take official action of any kind. Even if all seven members, more than the necessary quorum of four, attend the meeting, the same number of votes, namely three, is all that is necessary to take official action if that is the highest number of votes cast (plurality) in a given matter. Thus, if the minimum quorum of four is present, and the vote on a particular proposal is 3 in favor and 1 against, the proposal is adopted. If all seven members of the body attend and the vote on a particular proposal is 3 in favor, 1 against and 3 abstentions, the proposal is likewise adopted by the plurality vote. *Cf. United States v. Ballin,* 144 U.S. 1, 12 S.Ct. 507, 36 L.Ed. 321 (1892) (statute lawfully enacted where vote in House of Representatives was 138 yeas, 0 nays, and 189 not voting). Under this common law rule, in a seven-person body, the highest number of votes necessary to take official action is not dependent upon the fortuity of whether 4, 5, 6, or 7 members choose to attend the meeting **so long as the minimum quorum number is present.** If the rule were other-

wise, a member could attend the meeting and abstain from voting and have a different effect than if that person were absent from the meeting. The common law rule does not permit a member to attend and abstain from voting and yet demand that the highest number of votes required to take official action be more than if that member had been absent. This Court has previously observed that a member who attends a meeting and abstains can have the same paralytic effect as one who is absent: "[O]ne or a relatively few persons could, by their intentional absence from, or by their presence at a meeting and their failure to vote, or their casting a blank or illegal ballot, block indefinitely an important election or important legislation and thus paralyze government with obviously great harm to the public interest." *Meixell v. Borough Council of Borough of Hellertown,* 370 Pa. 420, 425, 88 A.2d 594, 596. (Emphasis added.)

*Zemprelli v. Daniels,* 496 Pa. 247, 436 A.2d 1165 (1981), applied the common law rule and dealt with language in the Pennsylvania Constitution that is similar to that contained in Section 1721–A(b) of the Charter School Law. In that case, the Governor sent a State Tax Equalization Board nomination to the Senate in 1981 which received 25 "yeas" and 22 "nays." The President of the Senate found that the requisite vote of a constitutional majority had been obtained and ruled the appointment confirmed. Senator Zemprelli objected to the President's ruling, arguing that the constitutional majority should have been computed on the basis of the total number of members "elected" to the Senate which was 50, rather than on the number then in office which was 48, and that the affirmative vote of 25 senators was insufficient to seat the nominee. The President overruled Senator Zemprelli rul-

ing that the nomination had achieved the majority vote mandated by article IV, section 8(a) of the Pennsylvania Constitution [7] because 25 senators constituted a majority of the 48 senators then in office.

Senator Zemprelli and four other state senators who voted against confirmation of the nominee filed a petition for review in the nature of *quo warranto* in our Supreme Court's original jurisdiction contending that the phrase "a majority of the members elected to the Senate" meant a majority computed on the basis of the total number of senators elected at a given time, whether such senators were in the words of Senate Rule XXII-8, "living, sworn, and seated." They further argued that the nominee was put into office by less than a constitutional majority and should have been ousted because 50 senators were "elected" and her nomination only received 25 affirmative votes. The Court disagreed, holding that their rational would "cause Article IV, Section 8(a) of the Constitution to require greater than a majority vote whenever there was a vacancy in the Senate" and would subsequently "place a proportionately greater burden on the executive branch when a vacancy or vacancies exist in the Senate, which could in turn encourage needless delay in filling appointive positions." *Zemprelli*, 496 Pa. at 259, 436 A.2d at 1171. In sum, the court concluded that "a majority of the members elected to the Senate" as employed in that subsection meant "a majority of the members elected, living, sworn, and seated." Id. at 261–262, 436 A.2d at 1172.

■ The School argues that we should not apply the common law rule to this case because the General Assembly would have provided for a "shifting quorum" like it did in the statute discussed in *Energy Pipeline Company v. Public Utility Commission (PUC)*, 541 Pa. 252, 662 A.2d 641 (1995). Pursuant to Section 301(d) of the Public Utility Code, 66 Pa.C.S. § 301(d), the PUC was required to have "[a] majority of the members of the commission *serving in accordance with law* shall constitute a quorum and such majority acting unanimously, . . . for any action." (Emphasis added.) In that case, the PUC, consisting of four members, voted on a matter and reached a 2–2 tie. After a revote was taken, another 2–2 tie occurred. The PUC's Chairman declared that "no action" had resulted and the matter was tabled for further consideration. Months later with only three members voting, the PUC unanimously voted to sustain the action against a public utility company. We held that a tie vote has the legal effect of denying the requested action and, because no one appealed that order, it was final. Reversing, our Supreme Court held the action based on the plain language of "section 301, where there are only four commissioners, three commissioners constitute a quorum, and those three commissioners must vote unanimously for the PUC to undertake any action. A two-two vote is not a majority to adopt or deny any action." *Energy Pipeline*, 541 Pa. at 257, 662 A.2d at 644. *Energy Pipeline* did not address the common law, but merely found that based on the specific language in the statute—"serving in accordance with law" that three members were necessary, and

---

7. Article IV, section 8(a) of the Pennsylvania Constitution provides:

The Governor shall appoint a Secretary of Education and such other offices as he shall be authorized to appoint. The appointment of the Secretary of Education and of such other offices as may be specified by law, shall be subject to the consent of two-thirds or a *majority of the members elected to the Senate as is specified by law.* (Emphasis added.)

that the majority of that quorum has to act unanimously.

Just as in *Zemprelli* and unlike in *Energy Pipeline*, nothing in Section 1721–A of the Charter School Law indicates that the General Assembly intended to abrogate the common law rule that a majority is determined by the number currently serving, not the total number of appointments that could be made to the Board. As in *Zemprelli*, if we were to adopt the Charter School's interpretation, a greater burden would be placed on the Board when a vacancy or vacancies existed, which could, in turn, encourage needless delay in deciding charter school appeals. As a result, "[a] majority of the members" of the Board for the purposes of establishing a

quorum pursuant to Section 1721–A(b) of the Charter School Law constitutes a majority of those members sitting on the Board at the time an order of an appeal is rendered. Because there were five members sitting on the Board and with at least three members in attendance when it reached its decision in the present case, a quorum of a majority of the members of the Board was present, thereby making the Board's July 19, 2006 order binding on the parties.

## II.

 The School then argues that the Board erred in its findings [8] and conclusions where it stated that the School failed to meet the "generally accepted standards

---

8. The Board made the following pertinent findings of fact:

● The 2001–2002 audit of the School showed that it had a positive general fund balance as of July 1, 2001, but during that year its total expenditures exceeded its total revenues by $222,881 and by June 30, 2002, it had a negative general fund balance of $108,567;

● The School's 2002–2003 audit was not issued until July 2004 because of management's delay in providing records or not having them in the correct format for the auditors;

● In the 2002–2003 audit report, the auditors did not express an opinion the accompanying general purpose financial statements as of June 30, 2003 because the School did not maintain complete and accurate accounting records with respect to the general ledger; it did not have available adequate evidentiary matter in support or records or transactions; and it had changes in employees and in the accounting systems during the period of audit which created a lack of continuity in the accounting system;

● In the year ending June 30, 2003, the School's expenditures exceeded its revenues by $902,551 and the general fund balance had a deficit of $1,055,443;

● The audit ending June 30, 2004, identified material weaknesses including serious deficiencies involving the recording, summarizing and reporting of financial data, and

weaknesses in the payroll area, including payroll check discrepancies and control over adding new employees and dropping terminated employees;

● For the year ending June 30, 2004, the School's expenditures exceeded its revenues by $340,349 and it overspent its budgeted general fund appropriations by $610,239;

● The School did not have sufficient cash to pay Mosaica Education and Charter School Management Services (Mosaica) its management fees for the fiscal year ending June 30, 2004, so it entered into note payable agreements with Mosaica that totaled $303,518;

● As of June 30, 2004, the principal amount of the School's long-term debt which included a mortgage on its building totaled $853,840;

● During the 2003–2004 fiscal year, the School continued to have problems with the IRS and at the end of the fiscal year owed the IRS $189,702 which was subsequently paid;

● In September and October 2004, the School issued two additional promissory notes to Mosaica totaling $561,416;

● After the October 2004 note was issued, the principal amount of the School's long-term debt totaled $1,415,256 less any amount that might have been paid previously on the two previously issued notes;

● As of June 30, 2004, the School had a negative general fund balance of $451,329.

of fiscal management or audit requirements" required by Section 1729–A(a)(3) of the Charter School Law, 24 P.S. § 17–1729–A(a)(3), because it consistently was in debt. The Board concluded that the School failed to meet generally accepted standards of fiscal management or audit requirements because it had a general fund deficit since at least June 30, 2002, when it began with a negative general fund balance of $108,562. By June 30, 2004, it had a negative general fund deficit of over $1 million, and even though it eliminated that deficit after that date, that was only accomplished by converting the accounts payable to Mosaica into long-term debt. It also noted that the School was not even paying the interest on the approximately $750,000 note it owed to Mosaica. Additionally, the School still had a negative childcare fund balance that could only be eliminated if future operations were profitable or funds were transferred from the general fund. The Board noted that the audit of the School identified "material weaknesses that included: serious deficiencies involving the recording, summarizing and reporting of financial data; no ongoing reconciliations for the general ledger accounts." Due to the School's history of operating with a general fund deficit since June 30, 2002, the Board concluded that the School was unable to reverse its fiscal problems and remain a viable entity into the future.

However, the School argues that it failed to consider relevant evidence provided by Sheila Winfrey–Brown (Ms. Winfrey–Brown), the regional controller for the Wilmington office for Mosaica who testified regarding the School District's culpability for those financial difficulties. Ms. Winfrey–Brown testified that the School had accounting and financial management systems in place to operate the School, but testified regarding the School's receipt of late payments from the School District which had caused a severe strain on its cash flow. She explained the payment history or non-payment history by the School District, stating that during the latter part of fiscal year 2004, she had to petition the Department of Education to seek payment for "per pupil amounts" due to the School from the School District for the time periods of January, February, March and April 2004. The Department of Education remitted payments directly to the School. That continued during the last few months of the fiscal year, and during the summer months, invoices were sent each month to the School District. The School did not receive any payments from the School District. The School received a payment towards the end of September representing payments for the summer months, and that had been the practice for fiscal years 2004 and 2005. Because payments were late, she explained that she had to prioritize which payments would be made and which would not be made, but priority was always made to pay employees first to ensure the ongoing viability of the School. She stated others payments that had to be made were to payroll taxes, the School's vendors, and when payments were not made, the School incurred interest, penalties and late fees. She admitted that the School had not paid its taxes for three successive quarters in June, September and December 2003, but stated that the School had ultimately paid its tax bill to the IRS in September 2004. Ms. Winfrey–Brown did not address the budget deficits for tax years 2004–2005 or for previous years.

Our review of the record indicates there was evidence that the School remained in debt from year to year with that debt consistently growing, and Ms. Winfrey–Brown's testimony did not address the problematic debt or any of the other audit problems found by the Board, but only the

delayed payments during 2004.[9] Therefore, the Board did not discount Ms. Winfrey–Brown's testimony, but properly determined that it did not address the issue of the long-term growing debt and the School's handling of that problem. Consequently, we agree with the Board that the School did not meet the generally accepted standards of financial management.

### III.

██ Regarding the School's academic performance of the students, the School alleges that the Board used the Pennsylvania System of School Assessment (PSSA), an incorrect standard for interpreting the academic progress of the students, and concluded that the School did not meet the requirements for student performance pursuant to Section 1729–A(a)(2) of the Charter School Law, 24 P.S. § 1729–A(a)(2). The School stated that the Board failed to evaluate the testimony of Naomi Johnson–Booker, Ph.D (Dr. Johnson–Booker), who provided evidence beyond the PSSA scores that the students at the School had advanced academically during their time at the School.[10]

Dr. Johnson–Booker testified that she was Regional Vice President of Curriculum Operations for Mosaica. It was her opinion that the results of the PSSA were culturally biased and not indicative of the growth taking place at the School because the children attending the School were from urban areas and they had different points of reference. She explained that when using the PSSA, which was only given once a year, it was difficult to assess advancement because it was given to different students every year. Instead, she believed that the Iowa Test of Basic Skills (Iowa Test) produced better results for all of the students at the School because that test provided a completely different type of assessment based on the information the students were being taught. The test was given twice a year, once in the fall and once in the spring. She stated that because the test was given twice, the School was testing the same students and assessing their advancement. Dr. Johnson–Booker explained that the Iowa Test had a normal curve equivalent with 50 being the mean. In the fall of 2000, in the language testing area, students had a 32.1 mean. By 2003, it was 39.7, up 7.6 points. In testing mathematics, in 2004, it went from 33.4 to 40.4, up seven points over a period of time.

9. We note that there was unrebutted testimony from William Gretton, the School District's Assistant Superintendent for Business Affairs, stating that to the extent that there were any delays in payment to the School, they were caused by the School's errors in the bills that it submitted because they contained incorrect information, i.e., names of students who did not attend the School, incorrect addresses, etc.

10. Relying on 24 P.S. § 17–1729–A(2), the School also argues that it was not its burden to establish that the students had obtained higher standardized test scores and steady improvement in the quality of performance-based assessments, but rather it was the School District's burden to establish that the School failed to meet the relevant requirements for student performance. However, that section of the Public School Code merely provides that the Board may choose to revoke or not renew a charter based on a school's failure to meet the requirements for student performance set forth in 22 Pa.Code Ch. 5 (relating to curriculum). It says nothing about whose burden it is to go forward. In any event, we advise the school that if a school submits an application to renew its charter, it is the school's burden of going forward to prove that it is entitled to have its charter renewed, including proving that its students obtained higher standardized test scores and they improved in the quality of performance-based assessments. It is not the responsibility of the school district because the school district is not the entity seeking the renewal.

The Board was not required to accept the Iowa Test as a measure, but could reasonably rely on the PSSA results, the uniform test used statewide to measure performance. It found that the School failed to meet its objectives that included higher standardized test scores and steady improvement in the quality of performance-based assessments.[11] In 2004, the School's PSSA scores in 8th grade math and reading and in 5th grade math showed more students scoring below basic than had done so in 2003. Also, the 2004 PSSA results showed that the School's 5th grade students scored 80 points lower in math and 50 points lower in reading than the School District's 5th grade students. The School's 8th grade students scored 20 points lower in math. The School's 5th grade scaled score for reading was better than only one of the 12 School District schools, and the scaled score for math was better than only three of the 12 School District schools.

Because there was substantial evidence that the School did not show improvement in the students' performance and it was within the Board's prerogative to rely on the PSSA results, we agree with the Board that this was also a ground for non-renewal of the School's charter.

Accordingly, the order of the Board is affirmed.

### *ORDER*

AND NOW, this *5th* day of *July*, 2007, the order of the State Charter School Appeal Board revoking the charter of the Ronald H. Brown Charter School, dated July 19, 2006, is affirmed.

---

11. The relevant findings of facts from the Board were as follows:
 - The School uses the PSSA as the basis for determining whether a school entity has made Adequate Yearly Progress (AYP) under the No Child Left Behind Act (NCLB);
 - The School's 2004 PSSA scores of 8th grade students in math showed zero% advanced, 10% scored proficient, 20% scored basic and 70% scored below basic. In comparison to the 2003 scores, the 2004 scores show no change in the advanced %, 1% more students scored proficient, 6% less students scored basic, and 5% more students scored below basic;
 - The School's 2004 PSSA scores of 8th grade students in reading showed 0% scored advanced, 27% scored proficient, 36% scored basic, and 36% scored below basic. In comparison to the 2003 scores, the 2004 scores showed no change in the advanced %, 3% less students scored proficient, 3% less students scored basic and 6% more students scored below basic;
 - The School's 2004 PSSA scores of 5th grade students on reading showed 2%

scored advanced, 13% scored proficient, 26% scored basic and 60% scored below basic. In comparison to the 2003 scores, the 2004 scores showed 2% more students scored advanced, 7% more students scored proficient, no change in students scoring basic, and 9% less students scored below basic;
 - The 2004 PSSA results for the School and the School District showed that the School's 5th grade students scored 80 points lower than the School District's 5th grade students in math and 50 points lower in reading; the School's 8th grade students scored 20 points lower in math;
 - Of the three School District schools that had a scaled score lower than the School in 5th grade math, one had a number of English as a Second Language (ESL) students, one was an alternative school for disruptive students, and one had beginners who were ESL students; the School's scaled score in reading was only better than the School District school that had beginners who were ESL students.